**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **LAVELLE EVANS, ID # 1830990,** | ) | |
| **Petitioner,** | ) | |
| **vs.** | ) | **No. 3:13-CV-0021-B  (BH)** |
| | ) | |
| **WILLIAM STEPHENS, Director,** | ) | **Referred to U.S. Magistrate Judge** |
| **Texas Department of Criminal** | ) | |
| **Justice, Correctional Institutions Division,** | ) | |
| **Respondent.** | ) | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Pursuant to Special Order 3-251, this case has been referred for findings, conclusions, and recommendation.  Based on the relevant findings and applicable law, the petition for writ of habeas corpus under 28 U.S.C. § 2254 should be **DENIED** with prejudice.

## I.  BACKGROUND

Lavelle Evans (Petitioner) challenges his conviction for capital murder in Cause F06-89332. The respondent is William Stephens, Director of TDCJ-CID (Respondent).

### A.  Factual and Procedural History

On December 18, 2006, the State indicted Petitioner for the murder of Crystal Jenkins (Victim) on or about October 8, 2006, in the course of committing and attempting to commit the offense of obstruction and retaliation.  The indictment alleged that Petitioner had previously been convicted of two prior felony offenses, i.e., possession of marijuana and burglary of a habitation. (Clerk's Record ("C.R."):2-3).  He pled not guilty and was tried before a jury in the 363rd Judicial District Court of Dallas County on August 26-28, 2008.   The state appellate court recounted the evidence at trial as follows:

> The aggravating element of "obstruction and retaliation" alleged in the indictment is the murder of a potential witness against appellant in a drug case in Arkansas.  Appellant and deceased were arrested and charged with conspiracy in a

drug case in El Dorado, Arkansas along with deceased's sister Felicia and appellant's brother Johnny. [FN2]  The cases against all four of them were consolidated into a single trial set for October 12, 2006 in Arkansas.  Of the four accused, deceased was the only one who had no criminal record.  In the immediate wake of the arrests, deceased claimed full responsibility for the drugs.  In a letter, she stated appellant had no knowledge of the drugs.  As the trial date approached, however, deceased, represented by an attorney, negotiated a deal with the district attorney to testify against the co-conspirators in exchange for a lesser sentence.  On the morning of October 7, the prosecutor in El Dorado spoke to appellant's attorney, notifying him that deceased had agreed to testify for the State.  The prosecutor also conveyed a plea bargain offer of thirty years' imprisonment to appellant.  Appellant's attorney met with appellant from 10:00 a.m. until noon October 7 to discuss this case.

Between 7:30 p.m. and 8:00 p.m. on October 7, deceased's brother Brandon saw deceased and appellant together in El Dorado.  Brandon and a friend were in a truck waiting at a red light when deceased pulled up behind them in her car.  Appellant was the only passenger in deceased's car.  Deceased declined an invitation from Brandon to go to a music festival, saying she and appellant were going to the house that deceased shared with another brother.  Later that night, deceased's car was found at the house, but deceased was not there.

On October 8, 2006, in El Dorado, deceased was officially reported missing.  El Dorado police lieutenant Jim Wade began looking for her at that time by interviewing people about deceased's whereabouts.

Meanwhile, in Dallas, Texas, Dr. Robert Jones (Jones) was walking around White Rock Lake in the early morning hours of October 8 while it was still dark outside.  At 5:03 a.m., Jones heard a gunshot that was followed by three or four more gunshots coming from the other side of the lake.  Jones reported the gunfire to the police at 5:05 a.m. [FN3]  Jones saw car headlights moving from the area where he had heard the gunshots.  Five or ten minutes later, George Prock, a Dallas police patrol officer, responded to the 911 call.  Jones saw a police car and search lights in the area.  Jones finished his walk at 6:00 a.m., at which time he saw several police cars in the area where he had heard the gunshots.  Near sunrise at about 7:00 a.m., Prock found the body of an unidentified woman in the 300 block of East Lawther Drive on the shore of White Rock Lake.  She had been shot three times, including once in the back of the head.  The police recovered a cigarette butt with some ash attached near the woman's body, along with a cigarette lighter and a cellular phone.  They also recovered bullets and bullet fragments.  Police detectives tracked down the cellular phone's owner.  The owner cooperated with the police.  The police determined that the owner had been at the lake with a friend prior to the murder, but neither had any involvement in the crime.  A DNA sample collected from the cigarette butt matched the decedent's DNA profile.  No other useful DNA evidence was found.  The bullets and fragments found near the decedent's body had been fired

from the same gun. No other physical evidence was recovered.

Robert Ermatinger, a Dallas homicide detective, testified police officers did not find deceased's body until about 7:00 a.m. Dineen Gordon, an officer in the Dallas crime scene response unit, explained that a cigarette butt with ash intact was significant because that meant it had not been there for very long. Kenneth Balagot, a forensic biologist with the Southwestern Institute of Forensic Sciences, testified the cigarette butt found near deceased's body had a DNA profile that matched deceased's DNA. The cellular phone found near the body yielded only a partial DNA profile which was consistent with both deceased's and Cindy Barraza's DNA. [FN4]

The medical examiner could not determine the precise time of deceased's death. The time of death was listed as "Found 7:08 a.m." The time listed on a death certificate does not necessarily show when death actually occurred. Deceased was not identified until ten days after her death. Detectives noticed that deceased was found wearing a unique shirt that said "Smokin in the Cove" on it. They determined the shirt referenced an internet blog for a group of speed board racers who traveled around the country and raced speed boats. On October 18, the police obtained fingerprints and identified the deceased. At that point, the murder investigation began to unfold in Dallas.

Meanwhile, in El Dorado, Wade had begun his "missing person" investigation. In the afternoon of October 9, the day after deceased was reported missing, Wade spoke with appellant. Appellant said he last saw deceased on the evening of October 7 at a Subway sandwich shop. Appellant said he and deceased visited for awhile, then appellant left. A surveillance video tape from the Subway shop showed both deceased and appellant were there on that date, but they appeared separately over thirty minutes apart. The videotape showed appellant entered the shop at 7:28 p.m. and left at 7:30 p.m. while deceased entered at 8:16 p.m. and left at 8:19 p.m. Appellant told Wade that when deceased "disappears," she goes to a man named Cedric Cook. Appellant said his calls to deceased on October 8 were unanswered. Wade also spoke to April McGraw (April), who identified herself as appellant's girlfriend. April said her phone number was "870-665-1077." April had no information about deceased's disappearance.

After deceased's body was identified, the El Dorado police obtained a search warrant for appellant's residence. Officer David Gates, an investigator with the Union County Sheriff's Department in El Dorado, testified he was part of a team that executed a search warrant on appellant's residence on October 18, 2006. When officers searched appellant's room, they found, among other things, two cellular phones. The phones were seized and listed on the search warrant return, but they were never logged into the property room. Gates kept the phones in his possession. [FN5] One of the phones was not functional for lack of a battery or SIM card; the

3

other phone was operational.  On the operational phone, the police found photographs of appellant, one of April and another of a boy believed to be appellant's son.  When the police obtained the records for the operational phone, they found the phone number was registered to Roshanda Sims.  At trial, Sims testified she and appellant dated previously.  She obtained the phone in August 2006 at appellant's request and for his exclusive use, and the number was "678-939-1927." [FN6]  Sims discontinued the account for appellant's phone in November or December of 2006.  Appellant's brother Johnny was not a suspect because he was in jail on October 7 and 8.

At trial, the State introduced into evidence the cellular phone records for appellant's phone.  The records reflect that between October 7 and October 9, appellant's phone had made or received at least 197 calls.  After focusing on the locations of the cellular towers that transmitted the calls, the police determined and the records revealed that appellant's phone left El Dorado at 10:30 p.m. on October 7, traveled to White Rock Lake in Dallas, then returned to El Dorado no later than 9:38 a.m. on October 8.  The records show that in the immediate vicinity of White Rock Lake, four calls were made.  Two calls were made at 4:33 a.m., one at 4:38 a.m., and one at 5:07 a.m.  Appellant's cousin, Jarvis Moore, received two of White Rock Lake calls: one at 4:33 a.m. and one at 4:38 a.m.  The records also show that Jarvis called appellant's phone at 7:44 a.m. on October 8.  When Jarvis woke up that morning, he discovered he had missed two calls from appellant's phone.  Jarvis returned appellant's calls.  The call lasted ten minutes, during which appellant told Jarvis about his meeting with his attorney, how much prison time he was facing, and that deceased was going to testify against him.  When Jarvis spoke to appellant, he thought appellant sounded upset.  Concerned about appellant's mental state, Jarvis asked his "Uncle Quinn" to go check on appellant.  The records show Jarvis's call was transmitted to appellant's phone by a cell tower in Marshall, Texas.  Marshall is between Dallas and El Dorado.  Some of the calls made from appellant's phone were "blocked" so the recipient could not see appellant's number on the called ID feature.

According to the records, at least four calls to appellant's phone were from Quinn Moore, including calls at 10:45 a.m., 11:47 a.m., 3:37 p.m., and 4:39 p.m.  At trial, Quinn Moore testified that as a result of Jarvis's call to him, he was worried appellant might be "suicidal or something."  Quinn wanted to check on appellant, but he did not talk to him.  The testimony of both Jarvis and Quinn was confirmed by the call logs for appellant's phone.

The phone records also show at least forty-eight calls were made to and from April's phone, with number "870-665-1077," and at least one call, at 10:46 a.m. on October 8, to the residence appellant shared with his mother.  Other numbers listed on the call log were unidentifiable because they were either assigned to pre-paid phones or to accounts with false names or addresses.

At the time of deceased's murder, appellant was on supervised release pending his sentencing in an unrelated federal case. One of the conditions of appellant's release was that he could not leave his residence without permission except for work or a medical emergency. Through a monitoring unit that used a phone line to transmit data from a device appellant wore on his wrist, a federal probation officer tracked the times appellant entered and left his home. Records show that at 5:30 p.m. on October 7, the home monitoring unit became disabled when someone disconnected it from a phone line, unplugged it, and opened it to remove the back-up battery. Anti-tamper tape had been removed to gain access to the battery. Records show the unit was re-connected and turned back on at 9:54 a.m. on October 8. Phone records from appellant's phone show he had arrived back in El Dorado no later than 9:38 a.m. on October 8. The monitoring unit recorded appellant's comings and goings before and after the interruption to its power supply, indicating that the unit itself was in good working order. Paul Brockway, an expert in monitoring systems, testified he has worked on monitors like the one used on appellant. He testified that on October 7 at 5:30 p.m., the unit reported "HMU-case tamper." Then, at 9:54 a.m. on October 8, the unit reported "HMU Power up." Brockway personally examined the unit. He determined the unit had been tampered with because the "anti tamper tape" had been pulled back so one could access the screws on the box. He explained that because the unit has a forty-eight-hour backup battery, simply unplugging the unit would not cause it to fail. The "HMU Power up" report meant someone had disconnected the battery and reconnected it. Brockway could not, however, testify when the unit had been tampered with.

Jeff Rogers, the Arkansas prosecutor on appellant's drug case, testified the drug case was set for trial on October 12, 2006. After Rogers met with deceased and her attorney about testifying for the State, he provided a summary of her potential testimony to the attorneys of the other co-defendants, as required by Arkansas law. He talked to appellant's attorney on Saturday, October 7, who told Rogers he was going to meet with appellant later that day. On October 8, Rogers learned that deceased was missing.

Tammy Albritton, a federal probation officer, testified that in October 2006, appellant was free on bond in a federal case. As a condition of his bond, appellant was required to wear a monitor and to leave his home only for work or other pre-approved outings. On August 30, 2006, Albritton conducted a standard home visit on appellant. She discovered that appellant had taken the monitoring device off his wrist. Appellant said he would "just leave it at home" whenever he wanted to go out. Probation officers could not determine how appellant removed the monitoring device from his wrist without damaging it. After that home visit, the monitor was replaced, and appellant was continued on supervision. On October 12, 2006, Shirley Evans, appellant's mother, called Albritton and said she had tripped over the phone cord and disconnected the monitor on October 7. Evans said the monitor was disconnected for about two or three minutes. When Albritton later asked appellant where he was

5

on October 7, appellant said he was at home most of the day, but was also outside working on some "plumbing problems." Appellant told Albritton he sometimes went to Subway Shop to use the restroom.

Crystal Jones (Crystal) testified she was once romantically involved with appellant's brother Johnny. Sometime in September 2006, without prompting from anyone, Crystal told deceased that if deceased testified in the drug conspiracy trial, her life would be in danger. Crystal testified she felt she was "just giving [deceased] some advice."

Appellant's mother Shirley testified that in October 2006, April was staying at her house. During that period of time, appellant was monitored from a unit that was hooked up to a phone line. The monitor box sat atop a television set in appellant's room. Sometime during the day on October 7, Shirley tripped over the phone line that was connected to the monitor, knocking it to the floor. The monitor box was put back on the television. Shirley was unaware, however, that the phone cord had become unplugged from the monitor box. Shirley testified that as a result of their plumbing problems, they had to go "up the street" to use the bathroom. Shirley did not remember telling a police officer that appellant had a barbeque that night. The next morning, Shirley left the house without knowing if appellant was there or not. According to Shirley, appellant's cellular phone number at that time was "870-814-9611." Shirley explained to the jury that she was on cancer medication and sometime had trouble "remembering things."

Shirley authenticated several letters written by appellant. In a letter dated June 6, 2008, appellant wrote to a friend that he could not have killed deceased because he spent the night out drinking with three other friends. In a letter dated February 3, 2008, appellant wrote to April, stating, "You say you don't have anything, but what you've lost is because of the choices that you've made and you probably think you have nothing else to lose, but you do, like me and [your child]." On April 26, 2008, April wrote to appellant, stating "I still love you and will do anything for you."

Appellant called two defense witnesses: Patricia Kellough and April. Kellough, a Dallas resident who knew both deceased and appellant, testified that during some of the time deceased was a fugitive on the Arkansas drug case, deceased had stayed with her in Dallas. During that time, deceased wrote a letter to the police taking full responsibility for the drugs. Deceased discussed this letter with Kellough. When she heard that deceased was missing, Kellough thought deceased was the type of person who would go alone in the early morning hours to conduct a drug transaction.

April testified she was appellant's former fiancee, but was no longer dating him. April said she never knew appellant to have a phone with the number "678-

6

939-1927." On rebuttal, the prosecution pointed out that April had made numerous calls to that number on October 7, 8, and 9, and she had even left several voice messages on that number. April verified that number "870-665-1077" was her cellular phone number. In October 2006, April lived with appellant and his mother. On October 7, she left for work at 6:30 p.m. Appellant stayed at home with her child. That night, April received several calls from appellant from number "870-881-8234." She also received several phone calls from a blocked number. When she answered the blocked calls, all she heard was static. At 7:10 a.m. the next morning, April returned home from work and saw appellant at his mother's house. When questioned by the prosecutor regarding appellant's June 6 letter in which he stated he was out drinking with friends on the nights of October 7 and October 8, April testified there was "no way" appellant would have left the house, and that he must have been lying in the letter.

[FN2] Johnny and Felicia were husband and wife. Deceased and appellant were "close friends, and maybe a little bit more." Appellant had a residence in Dallas, but had previously lived in Arkansas. Whenever appellant was in Dallas, deceased visited him about once a month.

[FN3] There were no further reports of gunfire to the police in the vicinity of White Rock Lake until after 5:00 p.m. on that date.

[FN4] The police linked Barraza to the cellular phone by calling a number listed for "Mother." However, Barraza was eliminated as a suspect in deceased's murder.

[FN5] The phones were admitted into evidence, over objection from the defense.

[FN6] The cellular phone with number 678-939-1927 will hereinafter be referred to as "appellant's phone."

*Evans v. State*, 2010 WL 779327, No. 05-08-01289-CR, slip op. at *1-5 (Tex. App.–Dallas, March 9, 2010, pet. ref'd). The jury found Petitioner guilty, and because the State did not seek the death penalty, the trial court automatically sentenced him to life in prison. (C.R.:44; R. 6:34-35).

On direct appeal, Petitioner alleged that the evidence was legally and factually insufficient to support his conviction. *Evans*, slip op. at *6-10. His conviction was affirmed. His petition for discretionary review (PDR) was refused on August 25, 2010. *See* PD-0413-10. He did not file a petition for writ of certiorari with the Supreme Court. Petitioner mailed his state habeas application

on February 7, 2011, raising the same claims he raises in his federal petition.   (State Habeas Transcript "S.H.Tr." at 7-12).   On October 10, 2012, the Texas Court of Criminal Appeals denied the state writ without a written order on the findings of the trial court.   *Id*. at cover.

Petitioner mailed his initial petition for federal habeas relief on December 29, 2012 (doc. 3), and mailed an amended petition on January 29, 2013, along with a brief in support. (Amen. Pet. at10).   Respondent filed a response on July 8, 2013, and provided the state court records.   Petitioner filed his reply on September 3, 2013.

**B.**      **Substantive Claims**

Petitioner raises the following claims for relief:

–the prosecution committed misconduct by (1) misleading the jury regarding the testimony of a State's witness; and (2) failing to turn over exculpatory or impeachment evidence to the defense (ground three);

–his trial counsel were ineffective by:

–failing to conduct an adequate pretrial investigation and interview witnesses;

–failing to file a meritorious motion to suppress;

–giving bad legal advice;

–failing to inform Petitioner of plea offers;

–failing to conduct an adequate voir dire;

–failing to impeach a prosecution witness;

–failing to object to prosecutorial misconduct; and

–intentionally sabotaging the defense by tampering with a witness and  eliciting prejudicial testimony;

–appellate counsel was ineffective by: (1) failing to meet with Petitioner; (2) filing an unfinished brief without first obtaining a copy of the trial record; (3) failing to file

8

a supplemental brief or a reply brief; and (4) failing to raise prosecutorial misconduct as an issue on direct appeal (ground four);

–Petitioner is actually innocent of capital murder (ground two); and

–the cumulative effect of the errors resulted in a fundamentally unfair trial (ground five).

## II.  APPLICABLE LAW

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104-132, 110 Stat. 1217, on April 24, 1996.  Title I of the Act applies to all federal petitions for habeas corpus filed on or after its effective date.  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Because Petitioner filed his petition after its effective date, the Act applies.

Title I of AEDPA substantially changed the way federal courts handle habeas corpus actions. Under 28 U.S.C. § 2254(d), as amended by AEDPA, a state prisoner may not obtain relief with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

>        (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

>        (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"In the context of federal habeas proceedings, a resolution (or adjudication) on the merits is a term of art that refers to whether a court's disposition of the case was substantive, as opposed to procedural." *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000).

Section 2254(d)(1) concerns pure questions of law and mixed questions of law and fact. *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001).  A decision is contrary to clearly established fed-

eral law within the meaning of § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). As for the "unreasonable application" standard, a writ must issue "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413; *accord Penry v. Johnson*, 532 U.S. 782, 792 (2001). Likewise, a state court unreasonably applies Supreme Court precedent if it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." 529 U.S. at 407. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409; *accord Penry*, 532 U.S. at 793.

Section 2254(d)(2) concerns questions of fact. *Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir. 2000). Under § 2254(d)(2), federal courts "give deference to the state court's findings unless they were 'based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.'" *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir. 2000). The resolution of factual issues by the state court is presumptively correct and will not be disturbed unless the state prisoner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

### III. PROSECUTORIAL MISCONDUCT

In his third ground for relief, Petitioner asserts that the prosecutor engaged in misconduct by misleading the jury as to the relevance of Crystal Jones' testimony and failing to disclose

10

exculpatory and impeachment evidence. (Brief at 28-31).

### A.    <u>Misleading Testimony</u>

Petitioner first asserts that the prosecutor misled the jury concerning the relevance of Jones' trial testimony.  He claims that her testimony gave the impression that she warned Victim about testifying against him, when in reality she did not know that he was a defendant in the Arkansas drug trial.  (Brief at 30-31).  This claim was denied on its merits by the Court of Criminal Appeals.  *Id.* at cover.  This denial is not an unreasonable application of federal law.

Jones' affidavit, submitted at the state habeas level and here, states that she believed that Victim was intending to testify against Petitioner's brother, Johnny Evans, when she warned Victim that it would be dangerous for her to testify.  Jones believed that Petitioner had told Victim to testify against his brother.  (Brief, Ex. 10).

At trial, Jones testified that she was the brother's girlfriend, but he was married to Victim's sister.  (R. 4:90).  She loved him although he was a prison inmate; he was in prison in October of 2006.  About a month before the Arkansas trials were to begin, she called Victim and asked to meet her.  (R. 4:91).  Although she knew Victim, they were not friends.  When Victim told her she was going to testify, Jones told her not to because it would put her life at risk.  (R. 4:97).  On cross-examination, Jones testified that she did not mean that someone would harm Victim, just that she did not believe that Victim should be doing that, and that her comment was not a threat.  She also acknowledged speaking to one of the defense attorneys by telephone and stating that her statement was not a threat, and that no one told her to speak to Victim or use the words that she did.  Finally, she testified that Victim told her that Petitioner was the one who told her to testify. (R. 4:98-100, 103-04, 107).  On re-direct, she testified that she had to be subpoenaed to testify, that she is friends

with Petitioner, and that she had recently sent him two letters stating that she did not threaten

Victim.  (R. 4:101-02).  She also stated that she did not believe that it was right for Victim to testify

against Petitioner's brother.  (R. 4:105).

Petitioner appears to assert that the prosecution questioned Jones in a manner that made her

testimony misleading.  The Supreme Court has held that the presentation of false evidence at trial,

as well as the admission into evidence at trial of unsolicited false evidence that is not corrected,

violates a criminal defendant's due process rights if the reliability of a given witness may be

determinative of guilt or innocence.  *Napue v. Illinois*, 360 U.S. 264, 269 (1959).  In order to prevail

on a claim that his constitutional rights were violated by the presentation of false testimony, a

petitioner must establish that: 1) the testimony was actually false; 2) the prosecution knew it was

false; and 3) that it was material.  *Napue v. Illinois*, 360 U.S. at 271.  Knowledge of falsity is

attributed to the prosecutor as the spokesperson for the government.  *Giglio v. United States*, 405

U.S. 150, 154 (1972).  The Supreme Court has also stated that a new trial is dictated only when the

false testimony could, in any reasonable likelihood, have affected the judgment of the jury.  *Napue*,

360 U.S. at 271.

Petitioner has not demonstrated that Jones' testimony was misleading.  Her affidavit

summarizes her trial testimony that she was warning Victim not to testify, that she thought Victim

was going to testify against her boyfriend (Petitioner's brother) rather than Petitioner, and that she

did not consider her statements to Victim to be a threat.  This claim is therefore without merit.

## B.     Exculpatory Evidence

Petitioner further asserts that the prosecution failed to inform the defense that State's witness

Jarvis Moore only testified after being threatened with prosecution by Arkansas law enforcement

officials.  He also asserts that the State failed to turn over a notarized statement from Victim taking full responsibility for the Arkansas drug charges.  These claims were denied on the merits by the Court of Criminal Appeals.  *Id.* at cover.  This denial is not contrary to federal law.

At the state habeas level and here, Petitioner submitted an affidavit from Moore, his cousin, and a notarized statement written by Victim prior to her death.  Moore's affidavit states that his testimony at trial was not voluntary and was "made as a result of being threatened by Union County, Arkansas Sheriff's officers." (Brief, Ex. 9).  Victim's statement is dated June 14, 2005, and is addressed to Petitioner's Arkansas attorney and the State of Texas Parole Board.  It states that all of the drugs and two guns seized in February from a house in El Dorado were hers, that another seized gun was her sister's, and that Petitioner was not aware of either the drugs or guns. (Brief, Ex. 22).  The lead prosecutor also submitted an affidavit at the state habeas level, stating that it was the Dallas Police Department who interviewed Moore.  It further states that Victim's affidavit was in defense counsel's possession, and he did not recall being provided a copy.  (S.H.Tr.:135).

At trial, Moore testified that he was close to Petitioner, that he did not want to testify, and that he was in jail in Dallas to guarantee his presence.  He had one misdemeanor conviction for marijuana, but no felony convictions. (R. 4:206-07).  After Moore testified, his attorney spoke to the trial judge about the need for keeping him in jail on a writ of attachment, explaining that Moore understood that he had to testify or he would be charged with a misdemeanor.  He further explained that Moore had been reticent to appear because his role in the case had been broadcast on television, and this had caused him to be ostracized and attacked by members of his family. (R. 4:217-19).  Moore himself promised the judge that he would return if recalled as a witness, and that he "came down here voluntarily."  At that point, the judge released him from jail. (R. 4:220-22).  The defense

introduced Victim's letter as an exhibit during its cross-examination of Victim's mother, and the letter was admitted.  (R. 4:23; R. 7:Def. Ex. 1).

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that a prosecutor must disclose evidence that is favorable to the defendant and material to his guilt or punishment.  "*Brady* claims involve 'the discovery, after trial of information which had been known to the prosecution but unknown to the defense.'" *Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir. 1994).  "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).  Evidence is material within the meaning of *Brady* only when there is a reasonable probability of a different result at trial had the evidence been disclosed. *Wood v. Bartholomew*, 516 U.S. 1, 5 (1995).

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict of confidence.  A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).  In other words, there must be "a 'significant possibility' of a different result to characterize the *Brady* materiality standard." *Strickler*, 527 U.S. at 300 (Souter, J., concurring).

Petitioner has failed to demonstrate that the prosecution violated *Brady* by failing to disclose either exculpatory or impeachment evidence.  Victim's statement was not in the prosecution's possession, and it did not exculpate Petitioner of the capital murder charge.  Moore's affidavit does not state that he was threatened with prosecution for a drug charge; it only states that his testimony

14

was not voluntary because he was threatened by Union County Sheriff's officers.  At trial, Moore

testified that he did not want to be there and had to be subpoenaed.  All parties knew that he was

there on a writ of attachment, and that he was an inmate in the county jail to ensure his presence at

trial.  Furthermore, outside the presence of the jury, his appointed attorney stated that Moore was

aware that he would be charged with a crime if he did not testify.  Petitioner has therefore not

demonstrated that there was any impeachment evidence against Moore that was not already known

to the defense.  Petitioner's third ground for relief is without merit and should be denied.

### IV.  INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

In his first ground for relief, Petitioner claims that his trial counsel were ineffective by: 1)

failing to conduct an adequate pretrial investigation and interview witnesses; 2) failing to file a

meritorious motion to suppress based on an allegedly insufficient search warrant; 3) advising him

to agree to a prosecution witness testifying by video; 4) failing to inform him of plea offers; 5)

failing to ask questions during voir dire to elicit potential racial bias; 6) failing to impeach

prosecution witnesses;7) failing to object to prosecutorial misconduct; and 8) intentionally

sabotaging the defense by tampering with a witness and eliciting prejudicial testimony.  (Pet. at 7;

Brief at 3-27).  Based on the record and the sworn affidavit of lead trial counsel, the state court

concluded that Petitioner's claims of ineffective assistance of counsel were without merit.

(S.H.Tr.:cover, 144-50).  This is not an unreasonable application of federal law.

The Sixth Amendment to the United States Constitution provides in relevant part that "[i]n

all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for

his defense."  U.S. Const. art. VI.  The Sixth Amendment guarantees a criminal defendant the

effective assistance of counsel, both at trial and on appeal.  *Strickland v. Washington*, 466 U.S. 668

(1984); *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). To successfully state a claim of ineffective assistance of counsel, the prisoner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced his or her defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). A failure to establish either prong of the *Strickland* test requires a finding that counsel's performance was constitutionally effective. *See* 466 U.S. at 696. The Court may address the prongs in any order. *Smith v. Robbins*, 528 U.S. 259, 286 n.14 (2000).

In determining whether counsel's performance is deficient, courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable assistance." *Strickland*, 466 U.S. at 689. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Id.* at 691. To establish prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *Williams v. Taylor*, 529 U.S. 362, 393 n.17 (2000) (inquiry focuses on whether counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair). Reviewing courts must consider the totality of the evidence before the finder of fact in assessing whether the result would likely have been different absent counsel's alleged errors. *Strickland*, 466 U.S. at 695-96.

## A. <u>Failure to investigate, interview, and call witnesses</u>

Petitioner first asserts that counsel was ineffective for failing to interview witnesses prior to trial or to interview them sufficiently. Petitioner acknowledges that a defense investigator traveled to Arkansas to interview potential witnesses he identified, and that several were subpoenaed to testify, but he asserts that several other witnesses could have been identified with further

16

investigation.  He claims that counsel should have interviewed and called Nancy Hicks, John Hicks, Donald Manning, Monica Clark, and Garland Phifer to testify, and they should have called Tekisha Johnson, who was present at trial, to testify on Petitioner's behalf.  (Brief at 4- 6).  He also asserts that had counsel interviewed Jarvis Moore and Crystal Jones prior to trial, counsel would have determined that Moore had an incentive to testify against Petitioner and that Jones' testimony was not relevant.  (Brief at 7-8).  Based on the trial attorney's affidavit, the state habeas court found that a defense private investigator traveled to Arkansas, conducted an investigation, spoke to potential alibi witnesses, and offered to pay for their travel to Dallas to testify.  These potential witnesses were inconsistent and unable to establish an exact date for their alibis.  The state habeas court further found that the defense investigator and counsel interviewed numerous potential witnesses identified by Petitioner as well as others who offered to speak to them.  Jarvis Moore was interviewed, but he did not want to testify for the defense because his testimony would not be helpful. (S.H.Tr.:149). The court concluded that Petitioner had failed to establish ineffective assistance of counsel.  This is not an unreasonable application of the *Strickland* standard.

At the state habeas level and here, Petitioner submitted several affidavits.  John Hicks and Donald Manning's affidavits state that they saw Petitioner at about 8:00 a.m. in El Dorado, Arkansas, on October 8.   Neither states that he was available and willing to testify to this information at trial.  Hicks' affidavit states that he did not "want to be involved", as his probation officer had already warned him about getting into trouble.  (Brief, Ex. 5, 6).  Tekisha Johnson's affidavit states that she was living with Petitioner's mother at the time Victim went missing, that Petitioner was at his mother's house that night, and that he went other places but was only gone for "one hour at a time, or maybe two at the most."  She also states that he left the house at between

17

7:30 and 8:00 a.m. the next morning.  She acknowledged that she was subpoenaed to testify at trial and appeared, but was told by the defense attorney and investigator that Petitioner would be convicted. (Brief, Ex. 8).  Franklin James submitted an affidavit stating that Petitioner was at his house in El Dorado, drinking, on the night Victim went missing.  James does not state that he was willing and available to testify.  To the contrary, he states that when he spoke to the defense investigator, the investigator told him that he would get into trouble if he said the wrong thing, so he decided to keep his mouth shut.  (Brief, Ex. 13).  Petitioner has not submitted affidavits from Garland Phifer or Monica Clark, only his own affidavit stating that they could verify that he was at Phifer's house on the evening of October 7, 2006, at about 7:40 or 8:00 p.m. (Brief, Ex. 7).  Petitioner also submitted no affidavit from Nancy Hicks, although he asserts that she should have been called as a witness.

Complaints of uncalled witnesses are not favored in habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy, and because allegations of what a witness would have stated are largely speculative.  *Day v. Quarterman*, 566 F3d 527, 538 (5th Cir. 2009).  To prevail on an ineffective assistance claim based on counsel's failure to call a witness, a petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense.  *Day v. Quarterman*, 566 F3d at 538; *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985).  Petitioner has failed to meet this burden.

The record reflects the defense's theory that Petitioner was at home in El Dorado when Victim went missing and was killed.  At trial, Petitioner's mother testified that he was working on plumbing problems at her house that night and might have had a barbeque there as well. (R. 4:140-

44).  Petitioner's former girlfriend, April McGraw, testified that she living at his mother's house at the time, that she worked the overnight shift that night, that Petitioner called her cell phone from his mother's home number five or six times, and he stayed at his mother's house all night. (R. 5:152-64).  Of the witnesses Petitioner asserts should have been called, only Tekisha Johnson was willing to testify, and her statement that Petitioner was gone from his mother's house a few times for an hour or two is not consistent with the testimony at trial.  The affidavits of the other witnesses do not state that they were available and willing to testify, and several have submitted no affidavit at all. Petitioner has failed to demonstrate ineffective assistance of counsel prejudicial to him for any alleged failure to investigate and interview alibi witnesses.

With regard to Petitioner's assertion that his attorneys were ineffective for failing to interview Moore and Jones, the record shows that Moore was interviewed, he did not provide any information that was helpful, and he testified for the State under duress under a writ of attachment. Jones acknowledged during her testimony that she had spoken to defense co-counsel by telephone prior to trial and had told the same story that she recounted at trial. (R. 4:103-04).  Counsel conducted an extensive cross-examination, during which she testified that she believed Petitioner had told Victim to testify. (R. 4:94-100, 103-04, 106-08).  Petitioner has not demonstrated that there is a reasonable probability the outcome would have been different had counsel interviewed or called more witnesses.  His attorneys were not ineffective in this respect.

## B.   <u>**Motion to Suppress**</u>

Petitioner asserts that his attorneys were ineffective for failing to seek suppression of the mobile phones seized from his mother's house because they were not listed in the affidavit in support of the warrant as items to be seized, and the warrant did not refer to the affidavit and was

not accompanied by the affidavit. (Brief at 12-16).  Lead defense counsel's affidavit explains that there was a motion to suppress within an omnibus pretrial motion, but he believed that the best attack was on the documentation of what was seized and the chain of custody. (S.H.Tr.:155). Petitioner has not demonstrated either deficiency or prejudice from the failure to file a motion to suppress the seized cell phones.

Petitioner asserts that the warrant was invalid because it did not specifically list cell phones. However, the search warrant affidavit encompasses the ability to seize "documents or instruments of a crime." (Brief, Ex. 14).  Included in the affidavit as grounds for seeking the search warrant are statements that Petitioner called Victim's sister at 7:00 p.m. the night she disappeared, that Victim was overheard agreeing to meet him, that there was a "no contact" order from the Arkansas court prohibiting contact between Petitioner and Victim, and that Petitioner's court-ordered monitor was off-line beginning at 5:30 p.m. that same evening.  *Id*.  Petitioner's cell phone could be an "instrument of a crime" under these circumstances.  Furthermore, the Fifth Circuit has recognized that cell phones may be considered the functional equivalent of records and documentation of drug activity. *See United States v. Aquirre*, 664 F.3d 606, 614 (5th Cir. 2011).  Finally, to the extent that Petitioner contends that the warrant was not valid because it does not contain the same list of items to be seized that are listed in the affidavit, this is a clerical error that would be subject to the good-faith exception to the Texas exclusionary rule so long as the warrant was issued by a neutral magistrate and was supported by probable cause.  *See* TEX. CODE CRIM. PROC. ANN. Art. 38.23(b) (West 1987).  Petitioner does not assert otherwise.

Rather than challenge the search warrant, counsel chose to object based on the chain of custody because the Arkansas law enforcement official who seized the cell phones kept them in a

separate evidence room rather than logging them in the police property room. (R. 5:48-57).  While

this objection was overruled, Petitioner has not demonstrated that counsel was ineffective.

**C.**     <u>**Video Testimony**</u>

Petitioner asserts that counsel was ineffective for advising him to agree to a prosecution

witness testifying by video from Arkansas.  He appears to argue that had he declined to do so, his

case would have either been dismissed, or this witness could not have testified. (Brief at 17-18).

Petitioner has failed to demonstrate any prejudice because he has failed to show any reasonable

probability that the outcome of his trial would have been different.  He has not shown that the

prosecution would not have been given another continuance.  Jeff Rodgers testified that he was

appearing by video because of a knee replacement a few days earlier with complications, and he was

not discharged from the hospital until the previous day. (R. 5:4).  Even if a continuance had been

denied, Petitioner has not shown that he would not have been convicted.  Rodgers testified that he

was the Arkansas prosecutor who was trying Petitioner and three other individuals on drug charges,

that Victim had decided to testify, and that he had informed Petitioner's attorney. (R. 5:4-8)  Similar

testimony was elicited from Victim's mother, Jarvis Moore, Crystal Jones, and Patricia Kellough.

Trial counsel was not ineffective in this regard.

**D.**     <u>**Plea Offers**</u>

Petitioner asserts that counsel was ineffective for failing to communicate plea offers.  He

does not assert that the State offered him a particular sentence for pleading guilty, and he concedes

that he may not have accepted any plea offer, but he asserts that he was not advised until after the

jury had been impaneled that the State did not intend to seek the death penalty. (Brief at 26).

Counsel's affidavit states that Petitioner "knew the state was not seeking the death penalty" and that

"[a]ny offers made were passed on" to him. (S.H.Tr.:155).  Based on this affidavit, the trial court

found that counsel did not fail to communicate plea offers.  Petitioner has not overcome the

presumption of correctness afforded these findings.  While failing to advise a client of a plea offer

may constitute ineffective assistance of counsel, *Teague v. Scott*, 60 F.3d 1167, 1171 (5th Cir. 1995),

Petitioner has presented only a conclusory allegation that any offer was not communicated to him.

Counsel was not ineffective for failing to communicate plea offers.

**E.**     **Voir Dire**

Petitioner also alleges that counsel was ineffective for failing to question potential jurors

about racial bias and interracial relationships, given that he is African-American and Victim was

white. (Brief at 24-26).  Counsel's affidavit states that he saw no reason to call attention to race

because Victim knew Petitioner, she was not an "innocent victim," and there was no sexual assault

or any indication that she was forced to associate with Petitioner. (S.H.Tr.:155).  Counsel's affidavit

indicates a strategic decision not to raise race as an issue at trial.  Petitioner has failed to overcome

the presumption that the strategy was a reasonable one. *Strickland*, 466 U.S. at 689.  Counsel was

not ineffective for failing to question potential jurors on the issue of race.

**F.**     **Failure to Impeach and Object**

Petitioner also asserts that the prosecutor committed misconduct by violating a motion in

limine, misleading the jury, calling defense witnesses liars, and attacking defense counsel's

character during his closing statement, and that his counsel was ineffective for failing to object to

this alleged misconduct.   He also claims that counsel failed to impeach witness Brandon Jenkins

with evidence that Petitioner was seen at a nearby Subway at the same time Jenkins said he saw

Petitioner with Victim, and for failing to impeach Brockway with evidence that not all of the tamper-

proof tape had been removed from Petitioner's monitoring system. (Brief at 8-10, 22-24).

Petitioner does not direct the Court to any motion in limine that was granted by the trial court, and none appears in the record. Even if one had been granted, Petitioner has not demonstrated that counsel was ineffective. Petitioner complains that the prosecutor improperly elicited testimony from an investigator by referring to the cell phone that Roshanda Sims gave Petitioner. (R. 4:76, 85-87; R. 5:67). Given Sims' testimony that she purchased the cell phone at Petitioner's request, as well as the testimony from Jarvis Moore that he called and spoke to Petitioner at that telephone number, and the testimony that Petitioner's picture was found on the phone when it was seized, he has not shown a reasonable probability that the outcome of the trial would have been different had counsel objected. As for Petitioner's complaint that the prosecutor committed misconduct during his closing statement, a review of the statement reveals a summation of the evidence or reasonable deductions from the evidence. These are permissible areas for jury argument. *Cobble v. State*, 871 S.W.2d 192, 204 (Tex. Crim. App. 1993).

With regard to Petitioner's assertion that counsel did not properly impeach prosecution witnesses, the state habeas court found that counsel throughly cross-examined witnesses. Counsel cross-examined Brandon Jenkins about the time that he saw his sister, and Paul Brockway about the state of Petitioner's monitor. (R. 4:52-54, 203-06). Jenkins' testified that he saw his sister "around" 7:30 or 8:00 p.m. This does not contradict the video from the Subway restaurant placing Petitioner there at 7:28 to 7:30 p.m. Brockway testified that the monitor sent a message that it was disconnected from the evening of October 7 to the morning of October 8, that this would not have occurred had his mother tripped over the phone line as she claimed, and that this would only have occurred if the battery had been removed. (R. 4: 195-203). No additional questions about the tape

on the monitor would have altered this testimony.  Petitioner has not demonstrated that counsel provided constitutionally deficient assistance by failing to ask additional questions of these witnesses.  Counsel was not ineffective for failing to object to alleged prosecutorial misconduct or failing to impeach State's witnesses.

## G.   **Sabotaging Defense**

Finally, Petitioner asserts that defense counsel intentionally sabotaged his defense by hiring an investigator who told Petitioner's mother that he was guilty and advised a potential witness that he "would get into trouble if he said the wrong thing" at trial, and by eliciting testimony from Jarvis Moore that Petitioner was a drug dealer. (Brief at 10-12).

Petitioner has not demonstrated either deficient performance or prejudice.  To the extent that the defense investigator gave his opinion that Petitioner was guilty, the evidence supports that opinion.  The statement to a potential witness that he could get in trouble if he testified falsely at trial was not incorrect.  Finally, it was well established through numerous witnesses, including law enforcement authorities, that Petitioner and Victim both dealt drugs.  Eliciting testimony from Moore that Petitioner was a drug dealer merely acknowledged what the record demonstrated.  Furthermore, defense counsel's affidavit explained the defense theory that Victim could have been killed by another drug dealer, as she was a known drug dealer herself. (S.H.Tr.:155).  Petitioner's trial counsel did not provide ineffective assistance, and his first ground for relief should be denied.

## V.  INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

In his fourth ground for relief, Petitioner asserts that appellate counsel was ineffective for: (1) failing to meet with Petitioner in person; (2) filing an unfinished brief without first obtaining a copy of the trial record; (3) failing to file a supplemental brief to add additional claims or a reply

brief; and (4) failing to raise prosecutorial misconduct as an issue on direct appeal. (Brief at 31-33). At the state habeas level, appellate counsel submitted a sworn affidavit. Based on this affidavit, the trial court found that retained appellate counsel obtained the trial court record on CD from appointed counsel, and provided Petitioner copies of the brief he filed, the State's brief, and the CD. (S.H.Tr.:151, 156-57). That court then concluded that Petitioner had failed to demonstrate that appellate counsel's performance was deficient, and that there is a reasonable probability that the outcome of the appeal would have been different due to the alleged deficiency. *Id.* at 152. The claim was denied by the Court of Criminal Appeals. *Id.* at cover. This denial is not an unreasonable application of the *Strickland* standard.

The federal constitution guarantees a criminal defendant the effective assistance of counsel on appeal. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). Whether appellate counsel has been ineffective is also determined by using the standard enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, Petitioner must show a reasonable probability that but for his counsel's deficient representation, he would have prevailed on his appeal. *Briseno v. Cockrell*, 274 F.3d 204, 207 (5th Cir. 2001).

To render effective assistance of counsel, appellate counsel need not raise every non-frivolous issue on appeal. *United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 1999). "Instead, to be deficient, the decision not to raise an issue must fall 'below an objective standard of reasonableness.'" *United States v. Phillips*, 210 F.3d 345, 348 (5th Cir. 2000) (quoting *Strickland*, 466 U.S. at 688). "[A] reasonable attorney has an obligation to research relevant facts and law, or make an informed decision that certain avenues will not prove fruitful. Solid, meritorious arguments based on directly controlling precedent should be discovered and brought to the court's attention."

25

*Williamson*, 183 F.3d at 462-63 (footnote and citations omitted).   To determine whether appellate counsel was deficient, courts must consider whether the challenge "would have been sufficiently meritorious such that [counsel] should have raised it on appeal."   *Phillips*, 210 F.3d at 348.

Petitioner complains about several aspects of appellate counsel's representation, but the only grounds he asserts that counsel should have raised are his claims of prosecutorial misconduct.  These grounds, however, were addressed at the state habeas level and here, and determined to be without merit.  Counsel was therefore not ineffective for failing to raise these claims on direct appeal.  *See United States v. Phillips*, 210 F.3d at 348 (holding that attorneys do not render deficient representation by failing to present meritless claims on appeal).  Counsel instead challenged the sufficiency of the evidence, and in a very detailed opinion, the state appellate court determined that the evidence at trial did support the verdict.  Petitioner has failed to demonstrate that had counsel met with him in person or filed a supplemental or reply brief, there is a reasonable probability that his conviction would have been reversed on appeal.  Petitioner's fourth ground for relief is without merit and should be denied.

## VI.  ACTUAL INNOCENCE

In his second ground for relief, Petitioner asserts that he is actually innocent of capital murder.  He points to affidavits from various people stating that they saw him in Arkansas during the time period that his cell phone was located in Dallas.  (Brief at 27-28).  He also asserts that testimony that he was seen with Victim in a car in El Dorado on the night she went missing was false because he was at a Subway restaurant in town at that same time. (Brief at 28).

In *Herrera v. Collins*, 506 U.S. 390, 400 (1993), the Supreme Court held that a claim of actual innocence based on newly-discovered evidence is not, and has never been held to be, a basis

for federal habeas relief absent an independent constitutional violation occurring in the state proceeding. It assumed for the sake of argument that in a capital case, a "truly persuasive" showing of actual innocence would render the execution of an individual unconstitutional and thus warrant federal habeas relief if no state avenue existed to entertain such a claim. The threshold showing for such an "assumed right" would be "extraordinarily high", however. *Id.* at 417. The Court then concluded that conflicting affidavits submitted eight years after a trial, when considered in light of the strong evidence presented at trial supporting guilt, did not meet this threshold. *Id.* at 417-18. Since *Herrera* was handed down by the Supreme Court, the Fifth Circuit has specifically rejected the argument that a showing of actual innocence would warrant habeas relief if there were no state avenue open to process such a claim. *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000), *cert. denied*, 532 U.S. 915 (2001). Accordingly, under both Supreme Court and Fifth Circuit case law, Petitioner is not entitled to federal habeas relief based on a claim of actual innocence.

Moreover, Texas does have an avenue in which to pursue actual innocence claims. In *State ex. rel. Holmes v. Third Court of Appeals*, 885 S.W.2d 389, 398-99 (Tex. Crim. App. 1994), the Texas Court of Criminal Appeals held that actual innocence could be a basis for state habeas relief where a petitioner established as a threshold that newly discovered evidence, if true, created a doubt sufficient to undermine confidence in the verdict. Subsequently, in *Ex parte Elizondo*, 947 S.W.2d 202, 208-09 (Tex. Crim. App. 1996), the court held that in order for a petitioner to prevail on an actual innocence claim, he must show by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence. Here, the state habeas court denied Petitioner's actual innocence claim on its merits. (S.H.Tr.:cover).

Even if federal habeas relief were available on the basis of a stand-alone actual innocence

claim, Petitioner would not be entitled to relief.  His evidence of his actual innocence consists of the affidavits he submitted at the state habeas level and here and his assertion that alleged conflicting testimony at trial demonstrates his innocence.  Given the amount of evidence presented at trial supporting Petitioner's conviction, and the fact that the affidavits he has submitted conflict with testimony given by defense witnesses at trial, he has not made a truly persuasive showing of his actual innocence.  His second ground should be denied.

## VII.  CUMULATIVE ERROR

In his fifth ground for relief, Petitioner asserts that cumulative constitutional errors infected his trial. (Brief at 33).  In *Derden v. McNeel*, 978 F.2d 1453 (5th Cir. 1992), the Fifth Circuit held that to prevail on a claim of cumulative error, a federal habeas petitioner must establish that: 1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; 2) the errors were not procedurally defaulted for habeas purposes; and 3) the constitutional errors so infected the entire trial that the resulting conviction violates due process.  *Id.* at 1458.

Petitioner has not shown constitutional errors that infected his trial such that his due process rights were violated.  The state court's denial of this ground was not contrary to federal law (*see* S.H.Tr.:cover, 152).  Petitioner's fifth ground for relief should be denied.

## VIII.  EVIDENTIARY HEARING

Upon review of the pleadings and the proceedings held in state court as reflected in the state court records, an evidentiary hearing appears unnecessary.

## IX.  RECOMMENDATION

The request for habeas corpus relief pursuant to 28 U.S.C. § 2254 should be **DENIED** with prejudice.

**SIGNED on this 4th day of June, 2014.**

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

29